

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

| | | |
|---|---|---|
| Martin J. Clarke<br>Assistant United States Attorney<br>marty.clarke@usdoj.gov | Suite 400<br>36 S. Charles Street<br>Baltimore, MD 21201-3119 | DIRECT: 410-209-4840<br>MAIN: 410-209-4800<br>FAX: 410-962-0716 |

April 3, 2023

Richard Bardos, Esquire
1 East Pratt Street, Suite 904
Baltimore, Maryland 21202

    Re:    *United States v. John Criscuolo*, LKM-23-0141

Dear Mr. Bardos:

    This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, John Criscuolo, (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by April 11, 2023, it will be deemed withdrawn. The terms of the Agreement are as follows:

<u>Offense of Conviction</u>

    1.    The Defendant agrees to waive indictment pursuant to Federal Rule of Criminal Procedure 7(b) and plead guilty to a Criminal Information charging him with the following offense: conspiracy to commit wire fraud, in violation of 18 U.S.C § 1349 (Count One). The Defendant admits that he is, in fact, guilty of this offense and will so advise the Court.

<u>Elements of the Offenses</u>

    2.    The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

<u>Count One – Conspiracy to Commit Wire Fraud</u>

a.    The Defendant and at least one other person entered into an unlawful agreement;

b.    The purpose of the agreement was to knowingly execute or attempt to execute a scheme or artifice to defraud and to obtain money, funds, assets or other property by means of materially false pretenses, representations, or promises; and

1

c.  The Defendant knowingly and willfully became a member of the conspiracy.

## Penalties

3. The maximum penalties provided by statute for the offense to which the Defendant is pleading guilty is as follows:

| Count | Statute | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 1349 | 20 years | 5 years | $250,000 | $100 |

a. Alternative Fine: If any person derived pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the Defendant, the Defendant may be fined not more than the greater of twice the gross gain or twice the gross loss. Given the amount of restitution the Defendant owes, this Office is not seeking a fine.

b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

c. Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d. Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

e. Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f. Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

Created With Tiny Scanner

<u>Waiver of Rights</u>

      4.      The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

      a.      If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

      b.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

      c.      If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

      d.      The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

      e.      If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

      f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

      g.      If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further

Created With Tiny Scanner

trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

      h.    By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

### Advisory Sentencing Guidelines Apply

5.    The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

### Factual and Advisory Guidelines Stipulation

6.    This Office and the Defendant understand, agree, and stipulate to the Statement of Facts set forth in Attachment A hereto, which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

### Count One – Conspiracy to Commit Wire Fraud

      a.    The parties agree and stipulate that pursuant to U.S.S.G. § 2B1.1(a)(1) the base offense level for Count One (conspiracy to commit wire fraud) is seven (7). Pursuant to U.S.S.G. § 2B1.1(b)(1)(H), an upward adjustment of fourteen (14) levels is applicable because the loss amount involved in the offense was more than $550,000 but less than $1,500,000, resulting in an adjusted offense level of twenty-one (21).

      b.    The parties also agree and stipulate that pursuant to U.S.S.G. § 3B1.1(c) a two-level (2) downward adjustment is warranted because the Defendant was a minor participant in the criminal activity, resulting in an adjusted offense level of fifteen (19).

      c.    This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the

Created With Tiny Scanner

Defendant's timely notification of his intention to plead guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Obligations of the Parties

9. At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, health, and conduct that this Office or the Defendant deem relevant to sentencing.

## Waiver of Appeal

10. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

   a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

   b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional

5

Created With Tiny Scanner

challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

    i. The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum; and

    ii. This Office reserves the right to appeal any sentence below a statutory minimum.

    c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Restitution

11. The Defendant agrees to the entry of a Restitution Order for the full amount of the victim's loss of $1,200,000 due and payable at the time of sentencing. The defendant shall make a bona fide effort to pay restitution in full as soon as practicable as determined by the Court and United States Probation. The Defendant agrees that pursuant to 18 U.S.C. §§ 3663 and 3663A and §§ 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The Defendant further agrees that he will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

## Forfeiture

12. The Defendant understands that the Court will enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses. More specifically, as part of the Order of Forfeiture, the Defendant agrees to the entry of a money judgment in the amount of $600,000, which represents the value of the property derived from, or otherwise involved in, the offense.

13. The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the change of plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. In accordance with Federal Rule of Criminal Procedure 32.2(b)(4)(A), the Defendant agrees that any Order of Forfeiture will become final as to him when the Court enters it. The parties acknowledge any Order of Forfeiture imposing a money judgment is enforceable against the Defendant only.

Created With Tiny Scanner

14. The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

15. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

### Tax Liability

16. The Defendant understands that this Agreement does not resolve any civil tax liability that the Defendant may have, and that this Agreement is with the United States Attorney's Office, not with the Internal Revenue Service. The Internal Revenue Service is not a party to this Agreement and remains free to pursue any and all lawful remedies it may have. The Defendant agrees, however, as a special condition of supervised release: (a) to execute a final and conclusive "Closing Agreement" with the Internal Revenue Service, pursuant to section 7121 of the Internal Revenue Code, in order to resolve tax liabilities for the years 2015 through 2019; (b) to provide a complete and accurate financial statement, under penalty of perjury, to the United States that shall identify all assets valued at $1,000 or more owned or held directly or indirectly by the Defendant, as well as all such assets transferred by the Defendant to any third parties since 2015, including the location of said assets and identities of the third parties; and (c) to pay to the Internal Revenue Service all additional taxes, interest and penalties that the Internal Revenue Service may determine that the Defendant owes for the tax years 2015 through 2019, pursuant to the aforesaid Closing Agreement. The Defendant understands that a failure to comply with any of the conditions of the Defendant's supervised release may result in revocation of the Defendant's release conditions, resulting in the Defendant's reincarceration for all or part of the term of supervised release.

### Defendant's Conduct Prior to Sentencing and Breach

17. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

18. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement,

Created With Tiny Scanner

even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

### Court Not a Party

19. The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

21. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Erek L. Barron
United States Attorney

Digitally signed by MARTIN CLARKE
Date: 2023.04.26 14:21:44 -04'00'

Martin J. Clarke
Harry M. Gruber
Assistant United States Attorneys

Created With Tiny Scanner

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

_4/18/23_
Date

John Criscuolo

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

_8/3/23_
Date

Richard Bardos, Esq.

9

Created With Tiny Scanner

## Attachment A

**The Defendant stipulates and agrees that if this case had proceeded to trial, the government would have proven the following facts beyond a reasonable doubt. The Defendant also stipulates and agrees that the following facts do not encompass all the evidence that would have been presented had this matter proceeded to trial.**

Citrus and Allied Essences (hereinafter "C&A") is a family-owned global business headquartered in New York that formulates and produces oils and extracts used in the food industry. C&A is affiliated with another company called Trilogy Essential Ingredients (hereinafter "TEI"), which produces flavoring ingredients and seasonings for the food industry. C&A has a manufacturing facility in Belcamp, Maryland, and TEI has a manufacturing facility in Abingdon, Maryland (hereinafter collectively referred to as C&A). Both facilities are in Harford County, Maryland. C&A uses large plastic and metal drums to package and ship their flavors and oils. C&A buys their drums from vendors located in various states.

The Defendant, John Criscuolo, a longtime resident of New Jersey, worked as a salesman in the commercial drum container business for over forty years. Prior to 2011, while working for USA Containers, the Defendant made a sales call to C&A. The Defendant initially met with two C&A employees, Carl Lembo and Elliot Kleinman. They agreed to purchase drums from USA Containers, but they told the Defendant that the price for each drum would have to be a few dollars higher than the average price so Kleinman and Lembo could get a kickback on each sale. To get C&A's business, the Defendant agreed to pay the kickback.

A few years later, Eugene DiNoto, another C&A employee, was promoted to purchasing agent in charge of ordering drums. As a result, DiNoto started to get a share of the kickback from USA Containers.

<u>P. Fernicola, Inc.</u>

After Kleinman retired, DiNoto told the Defendant that he wanted to make more money, and if the Defendant wanted USA Containers to continue doing business with C&A the Defendant would have to find another drum container business that DiNoto could do business with. DiNoto suggested the Defendant talk to Peter Schafer, the owner of P. Fernicola, Inc., a drum distributor in New Jersey who the Defendant knew. The Defendant agreed to speak with Schafer about a false invoicing scheme that the Defendant and DiNoto had been discussing to defraud C&A. The

scheme would involve Schafer, on behalf of Fernicola, sending false invoices to C&A for drums that Fernicola would never have to deliver.

In or about 2011, the Defendant met with Schafer to pitch the "ghost invoicing" scheme, and Schafer agreed to participate. The fraudulent billing scheme involved Schafer creating fake invoices to send to C&A. As the manager of the Harford County manufacturing facilities, DiNoto was able to choose which companies C&A purchased drums from and how many. He also had authority to review drum invoices and authorize payments to drum vendors.

Between approximately 2014 and 2020, on behalf of Fernicola, the Defendant, Schafer, and DiNoto coordinated the submission of more than 350 bogus invoices to C&A totaling approximately $6.27 million for steel and fiber drums that Fernicola never transported or delivered to C&A. Despite C&A never getting any of the drums listed on the false invoices, DiNoto approved the invoices for payment, and then had the invoices sent via interstate email from Maryland to C&A's accounting department in New York. There, based on DiNoto's authorization, checks were made payable to Ferniocla for the full amount of the invoices and mailed to Fernicola's principal office in New Jersey.

At Schafer's direction, Fernicola Employee-1 logged the receipt of the C&A check payments and created bank deposit slips. Schafer and Employee-1 corresponded with DiNoto by phone and interstate emails about how many and what type of drums should be included on the false invoices, and Employee-1 was responsible for typing and sending the invoices to C&A.

Schafer would cash C&A's checks and split the illegal proceeds with the Defendant and DiNoto. The Defendant's share depended upon the invoice amount, but he usually received $3,000 to $4,000 in cash a month, sometimes multiple times a month. DiNoto and Schafer split the balance of the proceeds from each invoice. The Defendant chose to split his share of the proceeds 50/50 with Lembo. Initially, the Defendant went to the office trailer at Fernicola to pick up an envelope with the cash from either Schafer or Employee-1. Later, Employee-1 met the Defendant at a Dunkin Donuts parking lot in New Jersey to deliver the cash kickbacks.

Kearney Steel Corporation

After the false invoicing scheme with Fernicola was underway, the Defendant and DiNoto began looking for second drum distribution business willing to defraud C&A. The Defendant and

2

DiNoto decided to approach the owners of Kearney Steel Corporation ("KSC"), a New Jersey drum vendor already doing business with C&A, but legitimately invoicing the company.

The Defendant met with Owner-1 at KSC's office and explained how the false invoicing scheme would work. Owner-1 agreed to participate in the scheme but only on an intermittent basis, *i.e.*, unlike Fernicola, Owner-1 agreed to send DiNoto a bogus invoice from time to time while still sending legitimate invoices for drums actually delivered.

Between approximately 2013 and 2020, on behalf of KSC, the Defendant, DiNoto, Owner-1, and Owner-2 coordinated the submission of more than 400 bogus invoices to C&A totaling approximately $9.8 million for steel and plastic drums that KSC never transported or delivered to C&A. The false KSC invoices were usually sent to C&A via US mail or interstate email. Despite C&A never getting any of the drums listed on the false invoices, DiNoto approved the invoices for payment, and then had the invoices sent via interstate email from Maryland to C&A's accounting department in New York. There, based on DiNoto's authorization, checks were made payable to KSC for the full amount of the invoices and mailed to KSC principal office in New Jersey.

The Defendant's share of the cash kickbacks depended on the false invoice amount, but he usually received $1500 to $2,000 per month, which he chose to split with Lembo. The Defendant would stop by KSC's offices to pick up his share in cash from Owner-1 or Owner-2. If they were not around, KSC Employee-1 would give him the cash in an envelope. The Defendant deposited some of the cash kickbacks in his personal checking accounts at Regal Bank and Valley National Bank.

Early in the scheme, the Defendant would also pick up DiNoto's share of the cash kickbacks from Owner-1, Owner-2, or KSC Employee-1 and travel to Maryland to hand deliver it to him. Later in the scheme, DiNoto's received his share of the cash kickbacks via FedEx packages sent to his home address.

_____

I have read this Statement of Facts and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. I do not wish to change any part of it.

_8/3/23_
Date

_John Criscuolo_

I am Mr. Criscuolo's attorney. I have carefully reviewed every part of this Statement of Facts with him. To my knowledge, his decision to sign it is an informed and voluntary one.

_8/3/23_
Date

_Richard Bardos, Esq._

4